**Leroy H. GRAW, Plaintiff,**

v.

**LOS ANGELES COUNTY METROPOL-ITAN TRANSPORTATION AUTHOR-ITY; et al., Defendants.**

**No. CV 97–8641 DDP (CWX).**

United States District Court, C.D. California.

June 10, 1999.

F.Supp.2d 1296, 1308-09.

Louis J. Cohen, Louis J. Cohen Law Offices, Calabasas, CA, for Plaintiff.

Thomas R. Malcolm, Jeffrey B. Kirzner, Lynne E. Mallya, Jones Day Reavis & Pogue, Irvine, CA, Richard T. Brouwer, Los Angeles County Counsel, Los Angeles, CA, for Defendants.

## ORDER DENYING DEFENDANTS DREW'S AND PHERNAMBUCQ'S MOTION FOR RECONSIDERATION

PREGERSON, District Judge.

This matter comes before the Court on a motion by individual defendants Joseph Drew and Stanley Phernambucq for reconsideration of a portion of the Court's ruling on their summary judgment motion. The Court denies the motion for reconsideration.

### I. Background

This lawsuit concerns plaintiff Graw's termination from a position with defendant Los Angeles County Metropolitan Transportation Authority. Individual defendants Drew and Phernambucq were Graw's supervisors at the time he was terminated.

On April 21, 1999, the Court issued an order denying in part and granting in part the defendants' motion for summary judgment. One of the issues considered in that order was the validity of plaintiff Graw's fourth cause of action, which asserted a claim of intentional interference with economic advantage against the individual defendants. Graw's complaint alleges that the termination tortiously interfered with his prospective economic relationship with the MTA and that the individual defendants acted "outside the course and scope of [their] authority, and for said individual defendant[s]' benefit and gain." (1 Am. Compl. at ¶ 87.) The complaint then alleges the essential elements of the California state law tort of intentional interference with economic advantage. (*Id.* at ¶¶ 88–89.)

The individual defendants moved for summary judgment as to this cause of action, asserting first that the individual defendants could not interfere with a relationship to which they were a party and second that former employees can never sue former co-employees. (Mot. for SJ at 8–11.) The Court denied this motion, refusing to apply the co-employee's privilege and noting that it was not convinced it

should apply an absolute privilege to interference.

The individual defendants have now moved for reconsideration, arguing that they are protected by privileges created by California law.[1]

## II. Discussion

Two privileges might be implicated in this matter. First is the "manager's privilege" as discussed for example in *Halvorsen v. Aramark Uniform Servs., Inc.*, 65 Cal.App.4th 1383, 77 Cal.Rptr.2d 383 (1998). Second is the privilege discussed in *Sheppard v. Freeman*, 67 Cal.App.4th 339, 79 Cal.Rptr.2d 13 (1998), which the Court will refer to as the "co-employee's privilege." Because these privileges represent distinct doctrines, they will be discussed separately.

### A. Manager's Privilege

■ The manager's privilege arises from the notion that while a disinterested third party may be liable for interference with a contractual or economic relationship, a party having an interest in that relationship must be judged differently. *See, e.g., Kozlowsky v. Westminster Nat'l Bank*, 6 Cal.App.3d 593, 86 Cal.Rptr. 52, 55 (1970) (citing Restatement of Torts § 769).[2] Because a managerial employee has an interest in benefitting his or her employer, acts by that employee seeking to benefit that employer do not give rise to

tort liability for interference with contractual relations or prospective economic advantage. *See, e.g., Aalgaard v. Merchants Nat'l Bank, Inc.*, 224 Cal.App.3d 674, 274 Cal.Rptr. 81, 86 (1990) (and cases cited therein); *see also* Witkin, *Summary of California Law: Torts*, § 673 (Supp.1998).

Thus, the manager's privilege is merely an application of the general rule that the tort of intentional interference with economic relations applies only to disinterested parties. As an interested party, a manager's actions are privileged.

Many courts have found an inherent limitation on this privilege, however. These courts hold that if the manager's actions were not for the benefit of the company, the manager loses his or her "interested party" status and can be liable for intentional interference. Essentially, these courts conclude that to the extent the manager is acting for his or her personal benefit and not for the benefit of the company, the manager is a stranger to the relationship between the employee and the employer. *See e.g., Halvorsen*, 77 Cal.Rptr.2d at 387–88 (citing cases); *Olivet v. Frischling*, 104 Cal.App.3d 831, 164 Cal.Rptr. 87 (1980).[3]

On the other hand, some California courts have held that the privilege applies even if the manager did not act for the benefit of the company. *See Halvorsen*, 77 Cal.Rptr.2d at 387–88 (citing cases).[4]

---

**1.** The original motion for summary judgment briefly addressed these issues. The motion for reconsideration discusses them in more detail.

**2.** As quoted by *Kozlowsky*, this section provides:

> One who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor
> (a) does not employ improper means, and
> (b) acts to protect his interest from being prejudiced by the relation.

86 Cal.Rptr. at 55 (quoting Restatement of Torts § 769). The Restatement Second of Torts echoes this rule. *See* Rest.2d Torts § 769.

**3.** *See also Sade Shoe Co. v. Oschin & Snyder*, 162 Cal.App.3d 1174, 209 Cal.Rptr. 124 (1984); *Rosenfeld, Meyer & Susman v. Cohen*, 146 Cal.App.3d 200, 194 Cal.Rptr. 180 (1983); *Richardson v. La Rancherita La Jolla, Inc.*, 98 Cal.App.3d 73, 159 Cal.Rptr. 285 (1979); *Culcal Stylco, Inc. v. Vornado, Inc.*, 26 Cal.App.3d 879, 103 Cal.Rptr. 419 (1972).

**4.** *See also Becket v. Welton Becket & Assocs.*, 39 Cal.App.3d 815, 114 Cal.Rptr. 531 (1974); *Marin v. Jacuzzi*, 224 Cal.App.2d 549, 36 Cal.Rptr. 880 (1964); *Wise v. Southern Pac. Co.*, 223 Cal.App.2d 50, 35 Cal.Rptr. 652 (1963); *Mallard v. Boring*, 182 Cal.App.2d 390, 6 Cal.Rptr. 171 (1960); *Lawless v. Brotherhood of Painters*, 143 Cal.App.2d 474, 300 P.2d 159 (1956).

Thus, there is no consensus of California decisions on this subject. *See id.; Aalgaard,* 274 Cal.Rptr. at 87 (describing California appellate decisions as a "knot of authority"). Therefore, this Court must make its own determination of the scope of the privilege. *See Commissioner of Internal Revenue v. Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

■ The Court holds that the manager's privilege applies if the manager acted at least in part to benefit the company. The individual defendants rely heavily on *Halvorsen*'s discussion of the policy reasons for creating an absolute privilege. But while *Halvorsen* asserts arguments for making the privilege absolute, 77 Cal. Rptr.2d at 389–90, these arguments take the privilege beyond its doctrinal foundation. As noted, the privilege was not crafted simply as a tool to protect managers. Instead, it was a natural outgrowth of the privilege to interfere with a relationship to which one is an interested party. A manager's interest stems from his or her duty to act to benefit the company. *See, e.g., Kozlowsky,* 86 Cal.Rptr. at 55. If the manager's acts were not done to benefit the company, the manager should not be deemed an interested party and should not enjoy the privilege to interfere with the economic relationship between the employee and the employer.

*Halvorsen*'s conclusion that a manager who is not an interested party must nevertheless be protected cannot be justified by interference doctrine. It thus transforms the privilege into something different from its doctrinal roots. The Court therefore agrees with the many California courts that refuse to apply an absolute privilege and the Court rejects *Halvorsen*'s holding.

Additionally, when the Ninth Circuit has applied California's manager's privilege, it has not used the *Halvorsen* standard. Instead, the Ninth Circuit has looked to the motives of the manager. *See McCabe v. General Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir.1987) (applying privilege "if an advisor is motivated in part by a desire to benefit his principal"); *Los Angeles Airways, Inc. v. Davis,* 687 F.2d 321, 328 (9th Cir.1982) (same). This supports this Court's rejection of *Halvorsen*'s conclusion.

■ Applied to the present case, this means that Graw has stated a claim for intentional interference. He has alleged that the actions of the individual defendants were "outside the course and scope of [their] authority, and for said individual defendant[s]' benefit and gain." (1 Am. Compl. at ¶ 87.) The individual defendants cannot invoke the protection of the manager's privilege.

## B. Co-employee's Privilege

The individual defendants also assert that they cannot be liable for intentional interference because they are protected by the privilege created in *Sheppard.* The individual defendants are correct that *Sheppard*'s holding was not limited to at-will employees. Nevertheless, the Court rejects that holding.

*Sheppard* concerned a former airline pilot who sued former co-employees, alleging that the co-employees had conspired to maliciously falsify data concerning his performance, which resulted in his termination. *Id.,* 79 Cal.Rptr.2d at 14. The *Sheppard* court noted that the appeal raised "an issue of first impression," namely: "Whether an employee or former employee can sue other co-employees individually based on their conduct relating to personnel actions, e.g. termination, demotion, discipline, transfers, compensation-setting, work assignments, and/or performance appraisals." *Id.* at 15.

The *Sheppard* court first noted that the California Supreme Court has "limited tort claims arising out of the termination of an employment relationship, holding that an employee has an actionable claim only where the employer's conduct violates public policy." *Id.* (citing *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 217, 765 P.2d 373 (1988)). The *Shep-*

*pard* court noted, however, that these cases did not address co-employee liability.

After noting that there exists "little analysis of coworker liability," the *Sheppard* court turned to consider "the deleterious effects on business" if employees could sue "by simply alleging malice and suing co-employees for damages on alternative tort theories, when the identical personnel action cannot give rise to tort damages against the employer." *Id.* at 15–16. The court noted that "all Sheppard's claims arise from the termination, which he alleges was caused by a conspiracy of false reporting by co-employees." *Id.* at 16. After consideration of the policy reasons to encourage "the input of employees," which facilitates "effective management," the *Sheppard* court concluded that "[t]he interest in allowing all employees the freedom to act and speak in relation to personnel actions without the threat of debilitating litigation outweighs the risk that a few employees will act maliciously and go undetected by their employers." *Id.* at 16–17. Therefore, the *Sheppard* court held that "an employee or former employee cannot sue individual employees based on their conduct, including acts or words, relating to personnel actions." *Id.* at 17.

The *Sheppard* court then considered whether this "co-employee privilege" applies to a co-employee's acts that were outside the scope of employment. The court stated that its "holding does not depend on whether an employee is determined to have been acting within his scope of employment" because a scope of employment requirement would "undermine[ ] the purpose and balance struck in insulating employees from personal liability . . . ." *Id.* "[W]hether someone was acting within his or her scope of employment will simply become one of the issues battled over in the lawsuit. . . ." *Id.* at 17–18. Further "all employees, regardless of their job descriptions, responsibilities or 'scope' should be permitted to speak or act freely in relation to personnel actions." *Id.* at 18.

Thus, *Sheppard* laid down a simple rule: a co-employee can never be liable for activities "in relation to personnel actions," even if those actions were otherwise maliciously tortious. *Id.*

*Sheppard*, however, did create two exceptions to its rule: First, the court noted that "[w]e do not intend by this opinion to limit co-employee liability for torts involving physical injury." *Id.* at 15 n. 4. Second, the court held that a co-employee may be liable for libel because "such liability arises from statute." *Id.* 19. The *Sheppard* court provided no explanation for the first exception; and as to the second, only noted "that the right to sue for libel is governed by statute, and that the Legislature has prescribed the circumstances under which this cause of action and the defenses and privileges pertaining thereto, may lie." *Id.* at 14.

Justice Kremer dissented from the majority's creation of the co-employee's privilege. He noted that the majority failed to analytically justify the exceptions it created and, more fundamentally: "The manifest practical and analytical problems engendered by the majority's approach demonstrate that creation of such broad extended immunity is a task more properly left to the Legislature." *Id.* at 20.

▉▉ As an initial matter, the *Sheppard* decision is not binding on this Court. *See Bosch's,* 387 U.S. at 465, 87 S.Ct. 1776. When a federal court applies a state law cause of action, it is bound by the interpretations of that state's Supreme Court. *See id.* If the state supreme court has not yet answered the question facing the federal court, the federal court must predict the decision of the state supreme court. *See id.* Though state appellate court decisions may have some weight in making this prediction, these decisions are not binding. *See id.*

The Court declines to apply the co-employee privilege because the Court rejects *Sheppard.*

As to *Sheppard*'s analysis, the Court has already noted some of the criticism set forth in Justice Kremer's dissent. The dissent notes that the majority does not explain why a tort involving physical injury should be different from other torts and also notes that this exception requires a distinction between "physical injury" and "emotional injury," a distinction that has been squarely rejected. *See id.*, 79 Cal. Rptr.2d at 22 (citing *Livitsanos v. Superior Ct.*, 2 Cal.4th 744, 7 Cal.Rptr.2d 808, 811–17, 828 P.2d 1195 (1992)).

The dissent also notes that the California Supreme Court has held that co-employees can be individually liable for acts that are "outside the scope of the compensation bargain." *Id.* at 21 (citing *Reno v. Baird*, 18 Cal.4th 640, 76 Cal.Rptr.2d 499, 502, 957 P.2d 1333 (1998)). There is no reason to assume that malicious torts are part of an employee's "compensation bargain."

In addition to the problems identified in the dissent, the *Sheppard* decision is flawed in other ways. First, *Sheppard* imposed its co-employee privilege even for acts that are outside the scope of the co-employee's duties so long as those acts relate to personnel actions. As an initial matter, *Sheppard*'s holding may not achieve its goal of preventing lawsuits because parties will now litigate whether the acts "relat[ed] to personnel actions." *See id.* at 17.

For example, the *Sheppard* court gave "discipline" as an example of "conduct relating to personnel actions." *Id.* at 15. Before *Sheppard*, a plaintiff might have conceded that a particular act was a "personnel action" but would have argued that it was so egregious that it was outside the scope of the co-employee's duties. After *Sheppard*, the plaintiff may merely argue that the particular act was so egregious that it was not "discipline" within the context of a "personnel action" but was rather harassment "which [is] not of a type necessary to business and personnel management." *Reno*, 76 Cal.Rptr.2d at 503, 957 P.2d 1333; *see Sheppard*, 79 Cal.Rptr.2d at 24 (dissenting opinion) (arguing that the scheme alleged by the plaintiff in *Sheppard* "did not involve 'conduct of a type necessary for management' ").

It is no more difficult to meritlessly allege that the action was not "of a type necessary for management," *id.*, than it is to meritlessly allege malice or to meritlessly allege that the action was outside the scope of the co-employee's duties. If *Sheppard*'s fears are correct and opportunistic plaintiffs are waiting to pounce on well-meaning co-employees, *Sheppard* will do little to stop them.

Second, there is no persuasive policy reason to protect an employee's malicious tort that is outside the scope of the employee's duties: By definition, malicious torts have negative social value. *Sheppard* argues that these few outside-the-scope-of-employment harmful acts must be tolerated so that employers may enjoy the many outside-the-scope-of-employment beneficial acts that might otherwise be stifled. However, the fact that these beneficial acts are outside the scope of employment indicates that the employer, who of course designates the scope of employment, attributes little or no value to these beneficial acts.

For example, consider the facts of *Sheppard* itself. In *Sheppard*, the plaintiff pilot sued a flight attendant for allegedly conspiring to maliciously submit a false evaluation of the plaintiff. The flight attendant's scope of employment did not include evaluating pilots. The *Sheppard* court nevertheless held that a malicious pilot evaluation by a flight attendant must enjoy a privilege in order to protect non-malicious pilot evaluations by flight attendants. This assumes that the flight attendant's pilot evaluations are so needed and desired by the employer airline that all evaluations by flight attendants must enjoy absolute privilege. But the fact that the airline did not designate the scope of the flight attendant's duties to include pilot evaluations fatally weakens this assumption. Indeed, the fact that the airline never instructed or expected flight attendants

to make pilot evaluations indicates that the airline did not care about or value their evaluations.[5]

*Sheppard* balanced the harm of a flight attendant's maliciously false pilot evaluation against the benefit of a flight attendant's good faith pilot evaluation. In doing so, however, it ignored the airline's own determination that it did not need or desire the flight attendant's good faith pilot evaluations. Thus, *Sheppard*'s balancing is flawed.

In addition, while *Sheppard* hesitated to declare an unqualified rule, its exceptions are flawed. First, *Sheppard* stated that "[w]e do not intend by this opinion to limit co-employee liability for torts involving physical injury." *Id.* at 15 n. 4. As noted earlier, the majority does not explain what a "physical injury" is. Further, the majority never explains why a tort "involving physical injury" should be different from any other tort.

The majority may have assumed that torts involving physical injury are more significant than torts that do not. But this assumption is incorrect. Neither a tortfeasor's culpability nor a tort's impact on its victim can be accurately assessed based on whether the tort resulted in "physical injury." As to the tortfeasor's culpability, while strict liability torts involving no culpability may result in physical injury, assault and battery, which are crimes, may not. As to the impact on the victim, many torts that egregiously violate the victim's fundamental interests do not result in physical injury. For example, neither false imprisonment, which violates the victim's liberty interest, nor battery, which violates the victim's bodily integrity, need necessarily result in any physical injury. Thus, because "physical injury" is linked to neither culpability nor impact, *Sheppard*'s

line drawing at "physical injury" is unpersuasive.[6]

The same is true regarding *Sheppard*'s exception for actions "arising from statute." The *Sheppard* majority permitted a libel suit against a co-employee because "the right to sue for libel is governed by statute, and ... the Legislature has prescribed the circumstances under which this cause of action and the defenses and privileges pertaining thereto, may lie." *Id.* at 14. However, *Sheppard* did not explain why a statutory action should be treated differently from a non-statutory action. One cannot assume that statutory actions are inherently more significant than non-statutory actions: breach of contract actions are extensively regulated by statute, civil actions for battery are not.

California law presumes that the fact that the Legislature addressed certain causes of action stems from a desire to clarify and codify common law rules. *See e.g.,* Cal.Civ.Code § 5 (provisions of code are to be construed as continuations of common law); *see also In re Elizalde's Estate,* 182 Cal. 427, 188 P. 560 (1920); *In re Reynold's Guardianship,* 60 Cal.App.2d 669, 141 P.2d 498 (1943). If so, that a cause of action is found in a statute is not probative of its importance or of the strength of the Legislature's desire to see that cause of action pursued. Therefore, the Court disagrees with *Sheppard*'s "statutory action" exception.

6 Another problem with *Sheppard* lies with its assumption that permitting co-employee liability would result in an influx of litigation, which would cause unacceptable damage to business efficiency. *See, e.g., id.,* 79 Cal.Rptr.2d at 15–16 (noting "deleterious effects on business" if privilege not created). However, one can ques-

---

**5.** While some employment duties, such as reporting theft or dangers to public safety, might have applied to every employee, evaluating a pilot's performance was not one of them.

**6.** Another problem with this exception is that a "physical injury" is present in many property torts, such as trespass to chattel for example. While the majority may have intended this exception to include only *"personal physical injury," see Sheppard,* 79 Cal.Rptr.2d at 22–23 (dissent), nothing in the majority's statement of this exception requires this interpretation.

tion whether this assumption is justified: *Sheppard* did not claim to address a gap in employers' protections that only recently arose. Instead, the danger of unjustified litigation found by *Sheppard* has existed for a long time. Nevertheless, *Sheppard* noted that this was "an issue of first impression" in California and was able to find "only limited analyses of the issue of co-worker liability in other states." *Id.* at 15 & n. 5. The fact that this issue has received so little attention suggests that *Sheppard*'s fear of a flood of harassing litigation is unjustified. The dearth of authority on this subject supports the conclusion that courts already have effective tools for dealing with harassing litigation, which undercuts the need to create a blanket privilege.[7]

The Court also questions *Sheppard* in light of other examples of appropriate balancing. This defect in *Sheppard* becomes apparent upon consideration of First Amendment doctrine. Probably no right deserves or requires more protection than the right to free speech. The First Amendment broadly states that "Congress shall make no ... law abridging the freedom of speech," U.S. Const. Amend. 1, and it has long been accepted that the First Amendment must enjoy significant "breathing space," *see, e.g., NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Finally, no speech deserves and receives higher protection than a statement about a public figure on a matter of public concern. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (public concern); *Cur-*

*tis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (public figure).

Despite these reasons to protect speech, to sue under tort law a public figure need only show that a defamatory statement was made with malice. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In other words, to ensure its "breathing space," the first amendment does not require absolute immunity from suit. The malice requirement acts as a sufficient hedge on inappropriate suits to protect this fundamental right.

Though there is no fundamental right to make personnel decisions, *Sheppard* created a privilege that protects even malicious acts. Thus, the *Sheppard* court determined that personnel decisions are so important that they require more "breathing space" than that afforded to the right of free speech. The Court rejects this outcome; if the malice requirement is sufficient to protect the constitutional right to free speech, it is sufficient to protect a company's ability to make personnel decisions.

In sum, *Sheppard*'s reasoning is flawed. This does not necessarily mean there cannot be any co-employee privilege, only that the line should not be drawn where *Sheppard* drew it. Most important, however, wherever that line should be drawn, it is the Legislature that should do the drawing. The above discussed problems with *Sheppard*'s analysis lend additional support to the dissent's assertion that "[t]he manifest practical and analytical problems engendered by the majority's approach demonstrate that creation of such broad extended immunity is a task more properly left to the Legislature." *Id.,* 79 Cal. Rptr.2d at 20.[8]

---

7. Among the tools for preventing harassing litigation are the provisions of Federal Rules of Civil Procedure 11, 12, and 56 and California Code of Civil Procedure §§ 422.10, 446, and 437c.

8. It must be noted that *Sheppard* does not assert that its outcome is dictated by any statutory scheme or by any legal precedent. While the individual defendants claim that *Sheppard*'s logic is echoed in *Reno,* 18

Cal.4th 640, 76 Cal.Rptr.2d 499, 957 P.2d 1333, that case is different from *Sheppard.* In *Reno,* the California Supreme Court extensively analyzed the statutory language of California's Fair Employment and Housing Act and concluded that "the Legislature has drawn a balance" that exempts individual managers from liability. 76 Cal.Rptr.2d at 513, 957 P.2d 1333. *Reno* does not support the proposition that the California Supreme

The Court concludes that if the question were presented to the California Supreme Court, that court would decline to approve a judicially created privilege of such broad dimensions. *See, e.g., People v. Christian S.*, 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 41, 872 P.2d 574 (1994) (refusing to alter established standards based on policy arguments because it "is a public policy issue properly left to the Legislature"). Therefore, the defendants' reliance on *Sheppard* is unavailing.

### III. Conclusion

The Court finds that the individual defendants are not protected by the manager's privilege and the Court declines to recognize the privilege discussed in *Sheppard*. Therefore, the motion for reconsideration is denied.

IT IS SO ORDERED.

Court would be willing to "draw a balance" with no guidance from the Legislature.